



LAW OFFICES OF STEVEN C. VONDRAN, P.C.
Steven C. Vondran, Esq. (SBN 232337)
620 Newport Center Drive, Suite 1100
Newport Beach, CA 92660
Phone: (949) 689-8752
Fax: (949) 417-0034
Email: Steve@VondranLaw.com

ATTORNEY FOR PLAINTIFF: Monique Tse

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

MONIQUE TSE, an Individual

      Plaintiff,

      vs.

WELLS FARGO BANK, N.A., a California
Corporation; CAL-WESTERN
RECONVEYANCE CORPORATION, a
California Corporation, NDEX West, LLC, a
Delaware Corporation, and DOES 1-1000,

      Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 3-10 CV. 04441 TEH

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS MOTION TO DISMISS**

Complaint Filed: August 23, 2010

Ca. Sup. Ct. (Sonoma) Case#: SVC248058

Hearing Date: 12/6/10 (vacated)
Time: 10:00 a.m.
Place: Courtroom 12, 19th Floor
Hon.: Judge Thelton E. Henderson

1

# **TABLE OF CONTENTS**

Pages

I.   Statement of Facts……………………………………………………………………2,4
II.  Summary of Defendant's Legal Arguments……………………………………4,5
III. Issues Presented……………………………………………………………………5

IV. Memorandum of Points and Authorities……………………………………5-22

(i) PRELIMINARY OBJECTION TO SUBJECT MATTER JURISDICTION……………5,6

(ii) STANDARD OF REVIEW IN RULING ON MOTION TO DISMISS……………..…..6

A. THE SUBSTITTUION OF TRUSTEE DOCUMENT IS BASED ON A FORGED SIGNATURE AND IS THE PRODUCT OF ROBOSIGNER FRAUD AND THE TRUSTEE THEREFORE HAD NO POWER OF SALE, THE TRUSTEE SALE IS VOID.

………………………………………………………………………………..7

B.  REGARDLESS OF THE STATUTORY SCEME, WELLS FARGO (WACHOVIA) AND THE TRUSTEE HAVE A COMMON LAW DUTY TO FULLY DISCLOSE THE TRUE NATURE OF THING BEING SOLD AT THE FORECLOSURE SALE WHERE THE THING BEING SOLD HAS ABSOLUTELY NO VALUE WHATSOEVER AND WHERE DISCLOSURE IS REQUIRED TO AVOID DECEIT AND FRAUD.  RECORDING STATUTES DO NOT PREVENT UNLAWFUL CONDUCT, AND THERE IS NO PRIVILEGE TO ACT IN A MALICIOUS MANNER AT A FORECLOSURE SALE………8-11

C. ACTS OF FRAUD AND DECEIT AT A FORECLOSURE AUCTION (AND EXERCISING THE POWER OF SALE BY AN INVALID TRUSTEE) ARE NOT LEGALLY PRIVIVILEGED, ESPECIALLY WHERE MALICIOUS CONDUCT HAS BEEN ALLEGED……………………………………………………………………..…..11-12

D. DEFENDANT HAS PLEAD PROPER CAUSES OF ACTION………..…………12-22

(1) Plaintiff has properly pled a cause of action for Fraud and Deceit (1st and 2nd causes of action) and Defendants Demurrer should be denied….…:……………………………………12-14

(2) Plaintiff has properly alleged elements of False Advertising under California Business and Professions Code Section 17500 (3rd cause of action) and Defendant's Demurrer should be denied……………………………………………………………………………..14-16

(3) Plaintiff has properly alleged elements of Unfair Competition (UCL) under California Business and Professions Code Section 17200 (4th cause of action) and Defendant's Demurrer should be denied……………………………………………………………………17-20

(4) Plaintiff has properly alleged a cause of action for Wrongful Foreclosure (5th cause of action) and Defendant's Demurrer should be denied...........................................................20-21

(5) Plaintiff has properly alleged a cause of action for Unjust Enrichment (6th cause of action) and Defendant's Demurrer should be denied.........................................................................22

V. Conclusion....................................................................................................22,23

## **TABLE OF AUTHORITIES**

**Cases**                                                        **Page(s)**

Murphy v. Walker, 51 F.3d at 717 (1995)……………………………………………………6

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)…………………………………………………6

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)……………………………………6

Peloza v. Capistrano Unified School Dist., 37 F.3d 517 C.A.9 (Cal.),(1994)…………………6

Abramson v. Brownstein, 897 F.2d 389, 391 (9th Cir.1990)……………………………………6

Love v. United States, 871 F.2d 1488, 1491 (9th Cir.1989)……………………………………6

Wutzke v. Bill Reid Painting Service, Inc., 151 Cal.App.3d at p. 43, 198 Cal.Rptr. 418. (1984)..7

George A. Karoutas v. Homefed Bank, 232 Cal.App.32 767, 283 Cal.Rptr. 809, (1991)………..8

Ostayan v. Serrano Reconveyance Company, 77 Cal.App.4th 1411 (2000)………………………9

Alfaro v. Community Housing Improvement System & Planning Assn., Inc. (2009) 171
                                Cal.App.4th 1355f [Cal.Rptr.3d]………….…..……….10

California Golf, L.L.C. v. Cooper (2008) 163 Cal.App.4th 1053, 1070-1071, 78 Cal.Rptr.3d 153
…………………………………………………………………………………………………11

In re Tobacco II Cases (2009) 93 Cal.Rptr.3d 559, 46 Cal.4th 298, 207 P.3d 20………………16

Brewer v. Indymac Bank, E.D.Cal.2009, 609 F.Supp.2d 110……………………………………...16

Colgan v. Leatherman Tool Group, Inc. (App. 2 Dist. 2006) 38 Cal.Rptr.3d 36, 135 Cal.App.4th
663. …………………………………………………………………………………………16

People v. Bestline Products, Inc. (App. 2 Dist. 1976) 132 Cal.Rptr. 767, 61 Cal.App.3d 879…16

Kasky v. Nike, Inc., 27 Cal. 4th 939, 949, 119 Cal. Rptr. 2d 296 (2002)………………………17

Stop Youth Addiction, Inc. v. Lucky Stores, Inc., 17 Cal. 4th 553, 566-67, 71 Cal. Rptr. 2d 731
(1998)………………………………………………………………………………..……18

People ex rel. Bill Lockyer v. Fremont Life Ins. Co., 104 Cal.App.4th 508 (2002)……………18

People v. Casa Blanca Convalescent Homes Inc., 159 Cal.App.3d 509, 206 Cal.Rptr. 164, 177
                        (1984)………………………………………………...18

Spiegler v. Home Depot U.S.A., Inc., C.D.Cal.2008, 552 F.Supp.2d 1036..........................18

Motors, Inc. v. Times Mirror Co., 102 Cal.App.3d 735, 740, 162 Cal.Rptr. 543 (1980). ........18

Hall v. Time Inc., 158 Cal.App.4th 847, 852, 70 Cal.Rptr.3d 466 (2008)...........................18

O'Brien v. Camisasca Auto. Mfg., Inc., 161 Cal.App.4th 388, 399, 73 Cal.Rptr.3d 911 (2008) .18

Juarez v. Arcadia Financial, Ltd., 152 Cal.App.4th 889 (2007)........................................19

Puentes v. Wells Fargo Home Mortgage, Inc. (2008) 160 Cal.App.4th 638,645....................19

Humboldt v. McCleverty, 161 Cal. 285, 290-91, 119 P. 82 (1911)....................................21

Dimrock v. Emerald Properties, 81 Cal.App.4th 868, 97 (2000)......................................21

Pro Value Properties Quality Loan Service Corp., 170. Cal.App.4th 579 (2009)..................22

**Statutes**

Fed. R. Civ. P Rule12(b)(6).............................................................................................6

Fed. R. Civ. P. 8(a)(2)....................................................................................................6

Cal. Civ. Code Sec. 1102................................................................................................8

Cal. Civ. Code Sec. 2924(d).........................................................................................11

Cal. Civ. Code Sec. Section 47...................................................................................11,12

Cal. Civ. Code Sec. 1709.............................................................................................14

Cal. Civ. Code Sec. 1710.............................................................................................14

Cal. Bus. & Prof. Code Section 17500..........................................................................14,15

Cal. Bus. & Prof. Code Section 17200..........................................................................17,18

**Other**

4 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1989) § 9:153, p. 504....................9

TO ALL PARTIES AND THEIR COUNSEL OF RECORD, COMES NOW MONIQUE TSE, ("PLAINTIFF"), by and through its undersigned counsel, in opposition to Defendant's Motion to Dismiss. Defendant has not responded earlier since Defendant failed to properly serve Plaintiff with a copy of his motion as set forth in the Order to Show Cause.

## I.
## STATEMENT OF FACTS

Defendant Wells Fargo owned both a First Mortgage and Second Mortgage. The previous borrower had defaulted on both loans. Wells Fargo ("WELLS") then filed a notice of default and notice of sale on the *second mortgage* and sent the *valueless "lien"* to foreclosure auction to its business partner Defendant NDEX, West, LLC ("NDEX") who purported to act as Trustee - although under what appears to be a fraudulent Substitution of Trustee using a Robosigner, Mr. Keo Vang (as set forth in greater detail below).

In furtherance of the scheme to defraud, WELLS and NDEX engage in a "*don't ask don't tell*" foreclosure sale policy wherein they auction off what is advertised as "property" when in fact all they are selling is a worthless second mortgage "lien," and no borrowers or bidders at the auction are informed that anything other than "property" is being sold as the Trustee's sales script will show.

On 11/23/09 Plaintiff attended the foreclosure auction, and upon learning that certain *real property* described with an address of 7594 Bernice Avenue, Rohnert Park, CA 94928-3805 was being sold, she placed a bid. As the high bidder, Plaintiff was informed she had bought the property and she took possession shortly thereafter. After Plaintiff received her Trustee's Deed and recorded such, she received a PROPERTY TAX BILL on 1/12/10 indicating SHE OWED $5,800 DOLLARS IN BACK TAXES.

2

However, after taking possession of the property and making valuable improvements, WELLS then foreclosed on the first mortgage forcing Plaintiff into eviction and literally forced her from the "property" she was lead to believe she had purchased. In the process, Plaintiff lost over $100,000 of her life savings that she had saved since high school working odd jobs.

This is not an isolated incident. See Attached **Exhibit "A"** which indicates the same thing happened to another California purchaser of property at a WELLS foreclosure auction where WELLS again held both the first and second mortgage and deceptively sold the worthless second at auction. When the news of this unlawful and deceptive business practice hit the mainstream media (New York Times), WELLS quickly settled the case refunding all their money. **WELLS knows this business practice is unlawful, deceptive, malicious and fraudulent, and they questioned their own business judgment. Why else would they settle in full when the disinfecting light of day shines on their business practice?**

The property in the present case was ultimately purchased by a company named *Trewell Investments*, LLC, which on information and belief is a company formed by *Mr. Henry Trione, who was at one time a Wells Fargo Vice President, a member of the Wells Fargo Board of Directors, and involved with the Wells Fargo Center for the Arts*. (See attached **Exhibit "B"**).

Plaintiff's complaint is based upon fraud, deceit, unfair competition, and clearly injurious business conduct by a major retail lender. Defendants should not be permitted to sell worthless liens at a foreclosure auction advertising and selling such *liens* as *property* at a foreclosure sale (the Trustee purported to take bids on the "*property*" and indicated that the "*property was being sold*"). After sufficient time has passed to make valuable improvements, the first mortgage is foreclosed on giving WELLS the benefit of both $100,000 for the sale of a worthless lien, and

3

increased revenues from the sale of the first mortgage. In this case, after the foreclosure sale on 11/23/09, the Notice of sale and Notice of Default for the first mortgage was recorded on 2/18/10 and 5/19/10 just enough time to get the benefit of the valuable improvements.

In regard to the Substitution of Trustee, Mr. Keo Vang purported to sign the documents on behalf of Wachovia Mortgage (WELLS), but as the attached **Exhibit "C"** shows, his signature cannot be trusted and Plaintiff alleges on information and belief that such signatures are a forgery. As such, the Substitution of Trustee is invalid and the sale is invalid. Plaintiff is entitled to a full return of her fees paid plus damages. Defendants, and each of them have been unjustly enriched. Their Demurrer should be denied. Plaintiff also requests leave to amend to address any deficiencies in the complaint, as well as to amend to add the robosigner fraud issue which was discovered only after the Complaint was filed. Plaintiff is conducting a handwriting analysis of the signatures of Keo Vang and other signors in Defendants chain of title for which they seek Judicial Notice.

## II.
## SUMMARY OF DEFENDANTS LEGAL ARGUMENTS

Defendant goes to great lengths to justify its injurious ***don't ask don't tell foreclosure sales scheme***. In their motion to dismiss Defendant contends the substitution of trustee was valid and that there is no duty to accurately describe what is being sold at the foreclosure auction, including lien position. Plaintiff disagrees. The Substitution of Trustee was the product of the fraudulent signature of a robosigner of Keo Vang. The notary stamp, designed to prevent fraud, thereby perpetrates the fraud. A fraudulent substitution of trustee results in no valid power of sale being conveyed to the trustee NDEX. The sale is void. The Notice of Sale is also void as *fruit of the poisonous tree* (the Notice of Sale failed to comply with statutory requirements as Defendant argues) given the Robosigner Fraud. Plaintiff disputes Defendant's contentions.

4

In addition, Defendant argues the trustee's sale is conclusive given a "*bona fide purchaser for value*" purchased the first mortgage at auction. Plaintiff disagrees. A former Wells Fargo Vice President and Board of Director's member (Henry Trione) purchased the property at the foreclosure auction. Plaintiff seeks leave to amend these critical points (The Veo Kang robosigner and Trione Purchase) that have come to the surface since the filing of the complaint.

Defendant also argues the *2924 Civil Code* Statutory scheme is comprehensive and no special disclaimers or disclosures are required at a foreclosure auction, yet the comprehensive scheme does not permit fraud, false representations, and deceit. There is no difficulty in disclosing that a junior lien is being sold when the Lender holds both the first and second mortgage. This is a simple task and Plaintiff disagrees that lien position, under these circumstances, does not need to be disclosed. Defendant asks that its motives not be questioned and argues their conduct is privileged and immune from attack. Plaintiff disagrees as there is no immunity for committing acts of fraud, deceit, and unfair competition and denies that Plaintiff has not raised and pled a valid cause of action for fraud, deceit, unfair competition, unjust enrichment, false advertising, and wrongful foreclosure.

**ISSUES PRESENTED:**

(1) WHETHER PLAINTIFF HAS PROPERLY ALLEGED VALID CAUSES OF ACTION FOR FRAUD, DECEIT, FALSE ADVERTISING, UNFAIR COMPETITION, WRONGFUL FORECLOSURE, AND UNJUST ENRICHMENT.

### III.
### MEMORANDUM OF POINTS AND AUTHORITIES

**(i) PRELIMINARY OBJECTION TO SUBJECT MATTER JURISDICTION**: PLAINTIFF HAS FILED OPPOSITION TO DEFENDANTS MOTION FOR REMOVAL ARGUING THAT

5

PLAINTIFF CANNOT SHOW DIVERSITY FOR SUBJECT MATTER JURISIDICTION. PLAINTIFF CONTINUES TO ARGUE THAT PLAINTIFF IS A CITIZEN OF CALIFORNIA AS CALIFORNIA IS ITS PRINCIPLE PLACE OF BUSINESS AS SET FORTH IN THE MOTION FOR REMAND.

**(ii) STANDARD OF REVIEW IN RULING ON MOTION TO DISMISS:** When considering a motion to dismiss under *Rule 12(b)(6)*, the Court accepts as true all facts alleged in the complaint and construes all reasonable inferences in favor of the plaintiff. See Murphy v. Walker, 51 F.3d at 717. To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In Peloza v. Capistrano Unified School Dist., 37 F.3d 517 C.A.9 (Cal.),1994, the Court stated that "on a motion to dismiss we are required to read the complaint charitably, to take all well-pleaded facts as true, and to assume that all general allegations embrace whatever specific facts might be necessary to support them." Citing Abramson v. Brownstein, 897 F.2d 389, 391 (9th Cir.1990). In addition, the Court must "accept the allegations as true and construe them in the light most favorable to the plaintiff." Love v. United States, 871 F.2d 1488, 1491 (9th Cir.1989).

6

## A. THE TRUSTEE (NDEX WEST, LLC) WAS NOT PROPERLY SUBSTITUTED AS THE SUBSTITUION OF TRUSTEE DOCUMENT IS BASED ON A FORGED SIGNATURE AND IS THE PRODUCT OF ROBOSIGNER FRAUD AND THE TRUSTEE THEREFORE HAD NO POWER OF SALE. THE TRUSTEE SALE IS VOID.

The Court should refuse to take judicial notice of a bogus and fraudulent substitution of trustee.   KEO VANG, (THE SIGNER ON THE SUBSTITUTION OF TRUSTEE DOCUMENT), ON INFORMATION AND BELIEF, IS A ROBOSIGNER AND HIS SIGNATURE ON THE SUBSTITUTION DOCUMENT A FORGERY.  Plaintiff incorporates their Opposition to Defendant's Request for Judicial Notice into this complaint and seeks to invalidate the Documents Defendant seeks to rely on that they allege establish validity of the Trustee Sale.  Plaintiff has recently learned that Mr. Keo Vang is on a known robosigner list compiled and maintained by Mr. Max Gardner, Attorney. (See Attached **Exhibit "D"** which is a true and correct copy of a document from Attorney Mr. Gardner's seminar dealing with Robosigners).  Plaintiff has recently learned of this list, and is obtaining additional signatures of Mr. Vang and a handwriting analysis to include in the first amended complaint, if permitted by the Court.  If the signatures are a fraud, then the Substitution of Trustee is invalid and thus the notice of default and notice of sale are also invalid and the trustee was without power to conduct a foreclosure sale.  The sale is void under these circumstances.

**A forged document is void ab initio and constitutes a nullity; as such it cannot provide the basis for a superior title as against the original grantor.** Wutzke v. Bill Reid Painting Service, Inc., 151 Cal.App.3d at p. 43, 198 Cal.Rptr. 418.

ON THESE GROUNDS PLAINTIFF DISPUTES DEFENDANT'S CONTENTION THAT ALL STATUTORY FORECLOSURE PROCEDURES WERE PROPERLY FOLLOWED PER STATUTE.

7

***B. REGARDLESS OF THE STATUTORY SCEME, WELLS FARGO (WACHOVIA) AND THE TRUSTEE HAVE A COMMON LAW DUTY TO FULLY DISCLOSE THE TRUE NATURE OF THING BEING SOLD AT THE FORECLOSURE SALE WHERE THE THING BEING SOLD HAS ABSOLUTELY NO VALUE WHATSOEVER AND WHERE DISCLOSURE IS REQUIRED TO AVOID DECEIT AND FRAUD.   RECORDING STATUTES DO NOT PREVENT UNLAWFUL CONDUCT, AND THERE IS NO PRIVILEGE TO ACT IN A MALICIOUS MANNER AT A FORECLOSURE SALE.***

Defendant Wells Fargo does not state in its opposition exactly *why* they would sell, or instruct their agent, NDEX to sell, a COMPLETELY WORTHLESS SECOND MORTGAGE "EQUITY LIEN" at the Foreclosure Sale conducted on 11/23/09.   Instead they insist "*motives are irrelevant*." (Motion to Dismiss P.8 ¶27).   This may be true in regard to the typical foreclosure sale, but not where a major retail lender intends to swindle people out of their hard earned money.   Defendant argues California Civil Code Section 1102 exempts them from having any duties in regard to a foreclosure sale (Motion to Dismiss P. 7 ¶21-22).   Plaintiff disagrees.

California case law supports the position that where a seller (beneficiary exercising the power of sale) knows of defects materially affecting the value of the property, that a ***common law duty of disclosure of the known facts*** is owed to the purchaser at the foreclosure sale.  See George A. Karoutas v. Homefed Bank, 232 Cal.App.32 767, 283 Cal.Rptr. 809, (1991).  In this case the Court stated (refuting Defendants argument that *Section 1102* does exempts them from any legal requirements not set forth in the statute):

> "Third, *we reject HomeFed's contention that section 1102.1 expressly excludes the imposition of a disclosure duty on the beneficiary*. Article 1.5 of the Civil Code, which includes section 1102.1, sets forth disclosures that must be made in the transfer of residential property. Section 1102.1, subdivision (c), *does nothing more than exclude transfers by a sale under a power of sale after default in an obligation secured by a deed of trust from "[t]he provisions of [article 1.5] ...."* (emphasis added) In so doing, it does not purport to eliminate any duties imposed in connection with transfers article 1.5 does not cover. Moreover, section 1102.8 declares that *"[t]he specification of items for disclosure in this article does not limit or abridge any obligation for disclosure created by any other provision of law or which may exist in order to avoid fraud, misrepresentation, or deceit in the transfer transaction*." Given this express limitation, we cannot ascribe to section 1102.1 the wide-ranging effect which HomeFed urges us to

8

adopt. *Neither the nonjudicial foreclosure statutes nor section 1102.1 prevents us from finding a duty to disclose.*" ..........(emphasis added).

Plaintiff relies on this case. The court in *Homefed* also stated:

"In their treatise on California real estate law, *Miller and Starr reach a similar conclusion regarding the existence of a common law duty to disclose*. Citing section 1102.8, they state that compliance with statutory disclosure requirements "does not relieve the parties of the general common law duty of disclosure." (1 Miller & Starr, Current Law of Cal. Real Estate, *supra*, § 1:123, at p. 421, fn. omitted.) Thus, "*where the beneficiary knows of serious defects in the property being sold, ... there should be some responsibility to disclose the defects to an innocent buyer*." (4 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1989) § 9:153, p. 504.).......... *Unlike a nonjudicial foreclosure sale, a tax sale is governed by the doctrine of caveat emptor.* (Emphasis added)."

AS MILLER AND STARR INDICATE, *CAVEAT EMPTOR* DOES *NOT* APPLY TO A JUDICIAL FORECLOSURE AUCTION AS DEFENDANT URGES. Defendant WELLS knows they are selling worthless liens at foreclosure auctions across California, and this materially affects the value of the property. This simple fact, well within their knowledge, and simple to disclose, must be disclosed in order to avoid a fraud, and deceit on auction bidders.

In addition, Defendants rely on the *Ostayan* case for the proposition that no "encumbrance history need be provided" (Motion to Dismiss P. 4 ¶4). Yet interestingly, in *Ostayan*, the trustee DID NOTIFY THE bidders at the auction that a junior lien was being foreclosed. The trustee in that case acted fairly and in an effort to avoid fraud and deceit.

Moreover, the Ostayan case holds only that "*detailed explanations concerning recorded encumbrances*" do not have to be disclosed as Defendant has cited in their brief (Motion to Dismiss P. 8 ¶3-4). There is nothing "detailed" required for a lender like WELLS (the holder of both the first and second loan) to inform its agent NDEX that Wells is requesting the junior lien be sold when it also holds the first. NO BURDENSOME *DETAILED EXPLANATIONS*

9

1   *REGARDING RECORDED ENCUMBRANCES* ARE REQUIRED. Instead, the *Don't Ask --*

2   *Don't tell* foreclosure scheme seeks to find its legitimacy by hiding within the Civil Code. This

3   is not what the legislatures intended. As referenced above, without the Court putting a halt to

4

5   this dubious practice, this practice continues to place California consumers at risk of serious

6   financial harm.

7        Defendant also argues that the buyer has a duty of due diligence and should have

8   consulted the complex system maintained by the County Recorder's office to ascertain what was

9

10  being sold at the auction. Several California cases have discussed Defendant's *County Recorder*

11  argument and *have disagreed that constructive notice relieves a seller of any liability for fraud*

12  *or deceit in a subsequent sale of the property*. For example, in Alfaro v. Community Housing

13  Improvement System & Planning Assn., Inc. (2009) 171 Cal.App.4th 1355f [Cal.Rptr.3d] the

14  Court stated:

15

16       "Plaintiffs argue that the doctrine of constructive notice does not apply to fraud causes of
         action. *Bishop Creek Lodge v. Scira* (1996) 46 Cal.App.4th 1721, 54 Cal.Rptr.2d 745 (

17       *Scira* ) stated on page 1734, 54 Cal.Rptr.2d 745: "*Under a long line of cases, the fact*
         *that the victim had constructive notice of the truth from public records is no defense to*

18       *fraud. The existence of such public records may be relevant to whether the victim's*
         *reliance was justifiable, but it is not, by itself, conclusive*. ( *Seeger v. Odell* (1941) 18

19       Cal.2d 409, 414-417, 115 P.2d 977 [ ( *Seeger* ) ] ...; *Grange Co. v. Simmons* (1962) 203
         Cal.App.2d 567, 576-577, 21 Cal.Rptr. 757 ...; *Gross v. Needham* (1960) 184 Cal.App.2d

20       446, 460, 7 Cal.Rptr. 664 ...; *Sullivan v. Dunnigan* (1959) 171 Cal.App.2d 662, 668, 341

21       P.2d 404 ...; *Regus v. Schartkoff* (1957) 156 Cal.App.2d 382, 389, 319 P.2d 721 ...;
         *Schaefer v. Berinstein* (1956) 140 Cal.App.2d 278, 296, 295 P.2d 113 ...; *Mills v.*

22       *Hellinger* (1950) 100 Cal.App.2d 482, 487, 224 P.2d 34 ...; *Barder v. McClung* (1949) 93
         Cal.App.2d 692, 697, 209 P.2d 808; *Stoll v. Selander* (1947) 81 Cal.App.2d 286, 292,

23       183 P.2d 935 ...; *Anderson v. Thacher* (1946) 76 Cal.App.2d 50, 70, 172 P.2d 533....)"

24       The rationale for this exception is, "The purpose of the recording acts is to afford
         protection not to those who make fraudulent misrepresentations but to *bona fide*

25       purchasers for value." ( *Seeger, supra*, 18 Cal.2d at p. 415, 115 P.2d 977.)"

26

27       In this case, Defendants recorded the Notice of Default and Notice of Sale, but this does

28  not excuse them from telling the truth at the Foreclosure Sale that there was no property being

                                                                                              10

sold, and instead, only a worthless "Equity Lien" was being sold. *This is a matter of basic fairness and law in a society that is supposed to be civilized.*

In addition, although Defendant argues the statutory foreclosure scheme is comprehensive and challenges to the sale are not permissible, other Courts have not agreed with this position. In California Golf, L.L.C. v. Cooper (2008) 163 Cal.App.4th 1053, 1070-1071, 78 Cal.Rptr.3d 153, the Court stated: "California courts have repeatedly allowed parties to pursue additional remedies for misconduct arising out of a nonjudicial foreclosure sale when not inconsistent with the policies behind the statutes." (Id. at p. 1070, 78 Cal.Rptr.3d 153.).

Defendant's Motion to dismiss should be denied and they should be forced to answer for their actions. In the alternative, Plaintiff seeks leave to amend.

## C. ACTS OF FRAUD AND DECEIT AT A FORECLOSURE AUCTION (AND EXERCISING THE POWER OF SALE BY AN INVALID TRUSTEE) ARE NOT LEGALLY PRIVIVILEGED, ESPECIALLY WHERE MALICIOUS CONDUCT HAS BEEN ALLEGED.

Next, Defendants argue that any FRAUD, DECEIT, OR LACK OF DISCLOSURE at the foreclosure sale is somehow LEGALLY PRIVILEGED if no malice is shown. But if swindling over $100,000 and valuable improvements from a homeowner with the intent to foreclose on the first mortgage after home improvements are made is not malicious, then what is? In addition, marketing a worthless lien as "property" at the foreclosure sale is malicious and unconscionable.

Defendant cites *California Civil Code Section 2924(d) & Section 47* (Motion to Dismiss P. 10 ¶19-28) which they argue protects "*performance of procedures*" and the "*mailing, publication, and delivery of notices.*"  Plaintiff has properly pled malice in regard to Defendants activities (Complaint P. 6 ¶24), as such, no immunity can be claimed. A fraudulent act by its very nature is malicious and an act of malice or fraud cannot, and should not be cloaked as

11

"privileged." Section 47(a) of the Civil Code also requires: "(a) In the **proper discharge** of an official duty" in order to claim any immunity. As referenced above, the Substitution of Trustee was invalid and the product of fraud, (KEO VANG signature on information and belief is a forgery), and no power to conduct a foreclosure sale can derive from this blatant fraud. Defendant NDEX was without property authority to conduct the sale and was not "properly discharging" any duties for it had no duties as a stranger to the transaction.

## D. **DEFENDANT HAS PLEAD PROPER CAUSES OF ACTION**

### (1) Plaintiff has properly pled a cause of action for Fraud and Deceit (1st and 2nd causes of action) and Defendants Demurrer should be denied:

Defendant claims there is no cause of action for fraud or deceit because "*both substitutions were properly recorded in the public records*" (Motion to Dismiss P. 2 ¶4), but as mentioned above, Plaintiff disputes this given the alleged Robosigner *forged signatures of Mr. Keo Vang who signature on the Substitution of Trustee document, on information and belief, are forged and fraudulent*. As such Defendants plea that "*the pre-foreclosure notices complied will all statutory requirements*" (Motion to Dismiss P. 2 ¶4), cannot also be true and defeats Defendants claim for immunity as discussed above, and lends nothing to their argument that there is no fraud involved. As discussed above, the information about Keo Vang was discovered after the complaint was filed, and Plaintiff seeks leave to amend to incorporate these findings into the first amended complaint.

In addition, in regard to the fraud cause of action, Defendant argues the "*who, what, when, where and why*" of fraud where not adequately plead (Motion to Dismiss P. 11 ¶1-2), and that Plaintiff has failed to allege a "*misrepresentation, knowledge of falsity, intent to defraud or justifiable reliance.*" (Motion to Dismiss P. 11 ¶15-16). But this is not true. Plaintiff has alleged that Defendant WELLS (**the *who***) intentionally withheld material omissions of fact, namely in

12

failing to disclose the nature of the thing being sold (a worthless lien) (**the *what***) at the foreclosure sale (**the *where***) on 11/23/09 (**the *when***) for its pursuit of profit and to cash in on Plaintiff's valuable improvements (**the *why***). Again, there is no "detailed encumbrance" history at issue that WELLS could decide not to disclose. They had the first and second and could have told its business partner NDEX the junior was being sold.   They had knowledge of material defects affecting the value of the "property" and had a duty to disclose this.   (Plaintiff's allegations can be seen in the complaint starting at page 10 ¶43 to page 11 ¶53).

Similarly, Plaintiff adequately alleged that NDEX West auctioned off the worthless HELOC lien and *affirmatively represented* such to be "property" and gave a property address that was allegedly being sold. The false representation was that "property" was being sold at the auction. There was no "property" sold, only a junior encumbrance lien with no value. (page 10 ¶ 46).

In regards to intent to defraud, WELLS wishes its motives not be questioned, but in fact Plaintiff has alleged WELLS made the material omissions, and allowed a worthless junior lien to be sold as *property* with the intent to defraud Plaintiff and take her money) and capitalize on her improvements WELLS knew she would make) by selling her something WELLS knew had absolutely no value.  Plaintiff has alleged Defendant intended to defraud Plaintiff (page 11 ¶50) wherein Plaintiff alleged: "*Such concealment of material facts of which a reasonable buyer would want to know, were made with the specific intent to induce Plaintiff to bid on the worthless note.*"  Plaintiff has adequately and specifically pled the elements of fraud, and NDEX, as (a false and disputed) Trustee falsely substituted by WELLS was purportedly authorized to speak as trustee on behalf of WELLS.   *If such is not adequately pled, Plaintiff seeks leave to amend their complaint.*

13

For the same reasons as above, Plaintiff has properly alleged a cause of action for deceit against Defendant. There is no immunity, no proper Substitution of Trustee, and the Defendant's acts are deceitful and malicious. The tort of Deceit is defined in *California Civil Code Sections 1709* and *1710*. Deceit takes place when: "*One who willfully deceives another with intent to induce the other to alter his or her position to his or her injury or risk is liable for any damage suffered as a result of the deceit.*" [Civil Code Section 1709].

Wells Fargo willfully deceived Plaintiff by causing a worthless second mortgage to be sold at a foreclosure auction under a DON'T ASK -- DON'T TELL POLICY and through the use of a deceptive sales script by its agent NDEX WEST which on information and belief, will show that ***NDEX affirmatively <u>asserted as a fact</u> that "property" was being sold at the auction when in fact a junior lien is all that was sold***.

There are four categories of deceit under Civil Code Section 1710, two of which are:

(2) the assertion, <u>as a fact</u>, of <u>that which is not true</u>, by one who has <u>no reasonable ground for believing it to be true</u>, commonly referred to as negligent misrepresentation;

(3) the <u>suppression of a fact</u>, by one who is bound to disclose it <u>**or who gives information of other facts which are likely to mislead for want of communication of that fact**</u>, commonly referred to as <u>**concealment**</u>.

Plaintiff has properly pled (as demonstrated above) and alleged in their complaint, that Defendants, through their auction sales scheme based on a ***Don't Ask – Don't Tell Policy*** have engaged in acts of deceit.    If the Court feels this was not adequately pled, Plaintiff requests leave to amend.

**(2) <u>Plaintiff has properly alleged elements of False Advertising under California Business and Professions Code Section 17500 (3rd cause of action) and Defendant's Demurrer should be denied.</u>**

14

1    Defendant argues there can be no false advertising claim because (among other things

2   previously addressed) the "*complaint fails to identify any false statement made by any*

3   *defendant.*" (Motion to Dismiss P. 2 ¶24-25). Yet Plaintiff has plead that NDEX west (the agent

4

5   of WELLS) falsely represented "property" was being sold, when in fact, at a minimum, WELLS

6   knew no property was being sold, rather only a worthless junior encumbrance.  Plaintiff has

7   alleged Defendant was *authorized* to speak as an agent of WELLS. (Motion to Dismiss P. 4 ¶

8   13). There is no immunity for false representations made at a foreclosure auction.

9

10   **California Business and Professions Code Section 17500 states:**

11
            "It is unlawful for any person, firm, corporation or association, or any employee thereof
12          **with intent directly or indirectly to dispose of real or personal property** or to perform
            services, professional or otherwise, or anything of any nature whatsoever or **to induce**
13          **the public to enter into any obligation relating thereto**, to make or disseminate or
            cause to be made or disseminated before the public in this state, or to make or
14          disseminate or cause to be made or disseminated from this state before the public in any
            state, in any newspaper or other publication, or any advertising device, **or by public**
15          **outcry or proclamation**, or in any other manner or means whatever, including over the
            Internet, any statement, concerning that real or personal property or those services,
16          professional or otherwise, or concerning any circumstance or matter of fact connected
            with the proposed performance or disposition thereof, which is untrue or misleading, and
17          which is known, or which by the exercise of reasonable care should be known, to be
            untrue or misleading, or for any person, firm, or corporation to so make or disseminate or
18          cause to be so made or disseminated any such statement as part of a plan or scheme with
            the intent not to sell that personal property or those services, professional or otherwise, so
19          advertised at the price stated therein, or as so advertised."
20

21

22   Defendants made public statements to the effect that they were selling real property at the

23   auction.   Plaintiff also got possession of the property.   Later, they were informed that they

24   bought an "equity lien" (worthless paper) and not the property and were in fact kicked off the

25   property.  Defendants are engaged in a principle/agency relationship and are jointly and severally

26   liable for the false statements they make and authorize.

27

28

                                                                                    15

To state a claim under either the Unfair Competition Law (UCL) or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the ***public are likely to be deceived***. In re Tobacco II Cases (2009) 93 Cal.Rptr.3d 559, 46 Cal.4th 298, 207 P.3d 20.   Under California law, a perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, ***such as by failure to disclose other relevant information***, is actionable as false advertising. Brewer v. Indymac Bank, E.D.Cal.2009, 609 F.Supp.2d 110.      A **"reasonable consumer" standard applies** when determining whether a given claim is misleading or deceptive under the False Advertising Law; a "reasonable consumer" is the ordinary consumer acting reasonably under the circumstances, and is not versed in the art of inspecting and judging a product, in the process of its preparation or manufacture. Colgan v. Leatherman Tool Group, Inc. (App. 2 Dist. 2006) 38 Cal.Rptr.3d 36, 135 Cal.App.4th 663.

In one California false advertising case, the Court held that Defendants were properly held liable as conspirators when it was established by evidence that they had **participated in dissemination of false information respecting a marketing program by sponsoring and staging meetings at which false information was disseminated** and by ***supplying scripts*** (like the foreclosure script used by NDEX WEST) used at meetings, motion pictures and narrated film strips displayed at meetings, and manuals and packets which encouraged general distributors and direct distributors seeking recruits to elaborate upon same deceptive theme. People v. Bestline Products, Inc. (App. 2 Dist. 1976) 132 Cal.Rptr. 767, 61 Cal.App.3d 879.

Whether or not Plaintiff has acted as a ordinary person is a question of fact for the jury, not to be decided by the conclusory statements of WELLS.   If the Court feels Plaintiff has failed to state a cause of action for false advertising, Plaintiff requests leave to amend.

16

**(3) Plaintiff has properly alleged elements of Unfair Competition (UCL) under California Business and Professions Code Section 17200 (4th cause of action) and Defendant's Demurrer should be denied.**

Defendant argues for more privilege and immunity for deceptive and malicious acts that may be deemed unfair and, thus, unlawful (Motion to Dismiss P. 12 ¶28). *They urge the Court not to exercise their own notions of what is fair and what is unfair* (Motion to Dismiss P. 12 ¶22-23), and they apparently argue that *California Civil Code Section 2924* et seq., dealing with foreclosure auction requirements permits them to auction off worthless junior liens as if it were "property," *yet a simple reading of the code teaches that the California legislature has not authorized this type of conduct, or approved any certain trustee sales script, and there is no specific "safe harbor" for this as Defendant argues in their brief.* (Motion to Dismiss P. 12 ¶15-16).

Defendant insists: "*Plaintiff has failed to allege any unlawful, unfair or fraudulent business acts on the part of Wachovia.*" Does WELLS think anything is "unfair" under 17200? They specifically sought to find a California consumer willing to take the bait and make valuable home improvements for their benefit, and to buy a lien with no value. The mindset is malicious and fraudulent and the resulting act is clearly unfair.

California's unfair competition law (*Business and Professions Code Section 17200* et seq.) defines "unfair competition" to mean and include "**any unlawful, unfair or fraudulent business act or practice**." See *Kasky v. Nike, Inc., 27 Cal. 4th 939, 949, 119 Cal. Rptr. 2d 296 (2002).* By defining unfair competition to include **any unlawful business act or practice**, "the UCL permits *violations of other laws to be treated as unfair competition that is independently actionable.*" In essence, an action based on the UCL to redress an unlawful business practice "borrows" violations from other laws and treats these violations, when committed pursuant to

17

business activity, as unlawful practices independently actionable under Section **17200** and subject to the distinct remedies provided there under.  See *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,* 17 Cal. 4th 553, 566-67, 71 Cal. Rptr. 2d 731 (1998).  Even purely "**unfair**" acts may be enjoined.

*There is no single definition for the phrase "unfair business practices." It is an evolving concept reflecting the ingenuity of unscrupulous business persons in concocting new schemes to gain advantage at someone else's expense*.  The existence of an unfair business practice is a question of fact determined in light of all the circumstances surrounding a case.  See People ex rel. Bill Lockyer v. Fremont Life Ins. Co., 104 Cal.App.4th 508, 128 Cal.Rptr.2d 463, Cal.App. 2 Dist.,2002.   An 'unfair' business practice occurs *when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers*." People v. Casa Blanca Convalescent Homes Inc., 159 Cal.App.3d 509, 206 Cal.Rptr. 164, 177 (1984) (citing Spiegel, Inc. v. F.T.C., 540 F.2d 287, 293 (7th Cir.1976)); Spiegler v. Home Depot U.S.A., Inc., C.D.Cal.2008, 552 F.Supp.2d 1036, affirmed 349 Fed.Appx. 174, 2009 WL 3358556.

California courts have long applied a balancing test to determine if an act or practice is unfair.  Under that test, "the determination of whether a particular business practice is unfair necessarily involves an *examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer*.  In brief, the court ... weigh[s] the *utility of the defendant's conduct* against the *gravity of the harm* to the alleged victims." Motors, Inc. v. Times Mirror Co., 102 Cal.App.3d 735, 740, 162 Cal.Rptr. 543 (1980).

The *Speigel* Court supra, held that recovery is limited to one who (1) "has suffered injury in fact," and (2) "has *lost money or property* as a result of such unfair competition." *Cal. Bus. & Prof.Code* § 17204; Hall v. Time Inc., 158 Cal.App.4th 847, 852, 70 Cal.Rptr.3d 466 (2008), modified by, 2008 Cal.App. LEXIS 139 (2008); see also O'Brien v. Camisasca Auto. Mfg., Inc., 161 Cal.App.4th 388, 399, 73 Cal.Rptr.3d 911 (2008) ("**under the UCL ... the plaintiff must have spent money, lost money or property**, or been denied money to which he or she was

18

entitled, due to unfair business practices or false advertising."). A Plaintiff damaged by an unfair act *may recover restitution of funds paid, or spent*. In Juarez v. Arcadia Financial, Ltd., 152 Cal.App.4th 889 (2007) the Court held:

> "In Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937 (Korea Supply), the Supreme Court concluded that "**restitutionary disgorgement**" is available under the UCL.......*restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest*." (Korea Supply, supra, 29 Cal.4th at p. 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937, citing Cortez v. Purolator Air Filtration Products Co. (2000) 23 Cal.4th 163, 178, 96 Cal.Rptr.2d 518, 999 P.2d 706.)

The basic premise of this type of remedy is that *"[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other*." (Rest. Restitution, § 1.). Plaintiff has carefully outlined the acts of Defendants which have caused serious injury to Plaintiff and which also continue to harm the general public at large. This is not an isolated incident. Defendant has no worthwhile explanation or justification for its "*fraudulent*" and "*oppressive*" conduct as alleged in Plaintiff's complaint, and even though they argue for immunity, safe harbor, and privilege, on balance, selling worthless junior liens to recoup undue profits and improvements is unfair under 17200 and Defendant must return all payments received under this deceptive and asinine scheme.

Moreover, In Puentes v. Wells Fargo Home Mortgage, Inc. (2008) 160 Cal.App.4th 638,645) the Court held:

> The term "fraudulent" as used in section 17200 "does not refer to the common law tort of fraud but only requires a showing members of the public ' "are likely to be deceived." ' " ( *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 839, 33 Cal.Rptr.2d 438; *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147, 135 Cal.Rptr.2d 796.) *Unless the challenged conduct "'targets a particular disadvantaged or vulnerable group*, it is judged by the effect it would have

19

on a reasonable consumer.' " ( *Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 806, 49 Cal.Rptr.3d 555.)

Here, Plaintiff is a female of asian descent vulnerable in regard to foreclosure sales and the deceptive acts of major retail lenders and their agents who are out to deceive her. As this is not the first incident of this kind, it appears WELLS is seeking out and TAREGETING vulnerable members of the California public to perpetrate their cash for worthless seconds and home improvements scheme. Defendant should be forced to justify their actions in front of a jury as the trier of fact as to the fairness of their business conduct that they would rather not have questioned.

Plaintiff has made several proper allegations in regard to each prong of the UCL law:

(a) "Fraudulent" – This was set forth in detail above

(b) Underlying Statutory Violations ("unlawful") Fraud, Deceit and False Advertising are prohibited by Statute in California;

(c) "**Unfair**" – **Plaintiff has alleged that the *Don't ask – Don't tell* (DADT) auction process which permits NDEX WEST (the agent for Wells) to sell worthless items at a foreclosure sale is completely unfair under any test or measure, especially when such is sold as "property" and not a "lien" that is easily known and can be easily disclosed by WELLS. This is a question of fact for the jury. In addition, a lender who holds both the first and second mortgage, and who chooses to foreclose on the second mortgage in order to get over $100,000 cash for a worthless piece of paper (unjust enrichment) and valuable improvements to capitalize on in the foreclosure of the first mortgage. The jury should decide whether this scheme is fair or unfair.**

Plaintiff has properly alleged the elements of wrongful foreclosure and Defendant's motion to dismiss should be denied. In the event Plaintiff has failed to properly allege this cause of action, she seeks leave to amend.

**(4) Plaintiff has properly alleged a cause of action for Wrongful Foreclosure (5th cause of action) and Defendant's Demurrer should be denied.**

1    Adding insult to injury, Wells raises the TENDER RULE ARGUMENT (Motion to

2   Dismiss P. 14 ¶11-23): '*Plaintiff must tender to the lender the full amount of the indebtedness*

3
    *(500k) if she wants to challenge the foreclosure sale*' argument citing principles of "EQUITY"
4
5   (as if their shady business practice is not tainted with dirty hands).  There should be no tender

6   requirement in this case applying nearly 100-year old case law precedent in California. See

7   Humboldt v. McCleverty, 161 Cal. 285, 290-91, 119 P. 82 (1911), where the court stated that:

8

9          "whatever may be the correct rule [about the tender rule], viewing the question generally,
           it is certainly not the law that an offer to pay the debt must be made, where it would be
10         *inequitable* to exact such offer of the party complaining of the sale." *See* Humboldt, 161
           Cal. at 291, 119 P. 82; *see also* 4 Miller & Starr, *Cal. Real Estate*, § 10.212 (3d ed. 2009)
11         ("Also, a tender may not be required where it would be inequitable to impose this
12         condition.").

13     Ironically, *Defendant is arguing that Equity be done, when it acts without a sense of*
14
    *equity.*  The Court should reject this principle and no tender should be demanded or required to
15
16  seek vindication for the wrongful foreclosure that caused Plaintiff's damages.  Furthermore,

17  given the fraudulent signature on the substitution of trustee (KEO VANG), which Plaintiff will

18  allege on information and belief if permitted to amend her complaint, to add this newly

19  discovered information, the **trustee's sale is void** and there is no need to tender the balance of
20
    the loan.  As the trustee sale is void as a matter of law, Plaintiff is entitled to a full refund of all
21
22  fees paid plus damages. See Dimrock v. Emerald Properties, 81 Cal.App.4th 868, 97 (2000),

23  which held *"In particular, contrary to the defendants' argument, he was not required to tender*

24  *any of the amounts due under the note" in order to attack a void trustee sale.*  In addition, as

25  one Court said, under these circumstances (void sale) restitution is proper: "Because the sale was
26
    void, the appropriate remedy for any damage to Plaintiff was the return of the purchase price,
27

28

                                                                                                    21

plus accrued interest.  See <u>Pro Value Properties Quality Loan Service Corp.</u>, 170. Cal.App.4th 579 (2009).

**(5) <u>Plaintiff has properly alleged a cause of action for Unjust Enrichment (6th cause of action) and Defendant's Demurrer should be denied.</u>**

The crux of Defendant's argument is that there is no unfair or unlawful conduct taking place in its sale of worthless junior liens.  As such, they argue there can be nothing unjust in unloading these worthless lien at a foreclosure sale, and having NDEX West sell the lien as if it were "property."  In addition, they fail to address the valuable improvements made, that they see as "to the victor go the spoils." **It is unjust to profit off something that has absolutely no value**. *Defendant knew the lien had no value and yet they sold it anyway and they gave time for the buyer to make improvements before then foreclosing on the first mortgage.* Under what test can this be considered "just?"  It is not.  It is greed manifesting itself in an injurious business practice.  Plaintiff has alleged a proper case for return of all benefits unjustly obtained by Wells through its unscrupulous scheme.

**CONCLUSION**

Defendants Wells Fargo and NDEX are simply hoping that the Court will not ask any serious questions as to why a holder of both a first and second trust deed would foreclose on the second mortgage and then sell the worthless "equity lien" as "property" at a foreclosure sale based under a *don't ask -- don't tell* policy.  While this may be sound public policy for the military, it hardly suffices as commercially reasonable business practices in the real world especially where so much financial damage is intentionally inflicted.  *When called out by the New York Times, Defendant settled -- they know their practice is malicious* and unfair.  Plaintiff has validly alleged causes of action as set forth in their complaint.  There are questions of fact for

22

the jury to consider as to whether their insidious practice is "unfair" under California law. Defendant's demurrer should be overruled as to each of the other causes of action.

In the alternative, Plaintiff respectfully requests leave to amend any deficiencies, and/or seeks leave to amend the complaint to add additional causes of action that have come to light since the filing of the original complaint.

Dated: November 26, 2010

THE LAW OFFICES OF STEVEN C. VONDRAN, P.C.

By _____
     STEVEN C. VONDRAN, ESQ.
     ATTORNEY FOR PLAINTIFF
     MONIQUE TSE

23

**The New York Times** Reprints

This copy is for your personal, non-commercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now



October 15, 2010

# Avoid Foreclosure Market Until the Dust Settles

By RON LIEBER

Are you out of your mind to even consider buying a foreclosed property right now?

Todd Phelps and Paul Whitehead didn't think they were last month when they were the winning bidders in a foreclosure auction on the steps of the main Riverside, Calif., county courthouse. They thought they had won the lottery.

For years, they had been living in a rent-controlled apartment in Santa Monica and waiting out the housing bubble in hopes of buying a weekend getaway in the Palm Springs area. And on Sept. 10, they thought they had finally done it, getting a house for $137,000.

Several days later, however, they realized that what they had really bought was a second mortgage from Wachovia on a house that still had an enormous, unpaid primary loan. In other words, they did not own the home free and clear, and the auction company wouldn't give back their $137,000 check.

The tale is certainly enough to give anyone pause, especially as several banks slow or halt their foreclosure proceedings amid questions about how they cut corners to speed up the process. Still, roughly half the recent home sales in hard-hit states like California, Arizona and Nevada have been foreclosures or short sales, according to RealtyTrac. Anyone wanting to buy homes in those and other states hit hard by the housing crisis will probably encounter these sorts of properties.

And the houses will be tempting for scores of first-time homebuyers, second-home seekers and people looking to get an early jump on buying a retirement home while prices and interest rates are low.

So given the pitfalls, are they crazy? The answer is no, not always. But it's important to keep something in mind.

"The whole foreclosure process is adversarial, even though it's nonjudicial in many areas," said Tom Cahraman, the presiding judge in Riverside County. "One person is losing their home, and another person is trying to get a new home at a discount price."

He's absolutely right. Strap on the body armor, and think hard about the following five factors if you find foreclosed homes even remotely enticing.

**THE LOAN** First of all, many banks that own foreclosed properties would prefer that you stay far away from their listings. In fact, they may sell a property for less money to an investor who can pay all cash.

You, on the other hand, will probably need a mortgage, and your need for bank approval can delay the sales process because your lender may hesitate when you say you're interested in a foreclosed property.

"Lenders will usually only give you a loan on homes that are pretty ready to be lived in," said Andy Tolbert of Oneir HD Realty in Longwood, Fla., who represents buyers shopping for foreclosed and other homes and invests in distressed property herself. "If the carpet is ripped out and the toilets are missing, they are not going to give the loan."

This is especially important to consider if you're using a Federal Housing Administration or Veterans Administration loan, where there may be particularly stringent requirements. "I have seen V.A. lenders require torn carpet to be repaired or replaced because they see it as a hazard to the new occupants," said Mike Goblet, a mortgage broker with United Mortgage Financial Group in Mesa, Ariz.

There are some exceptions. The F.H.A. offers a mortgage called a 203(k) that may allow you to borrow money to buy and substantially rehabilitate a foreclosed property. But it could take a while to find a bank that offers the loan and to get your project approved. Some sellers, meanwhile, won't let you buy with F.H.A. loans.

**THE AUCTION PROCESS** Foreclosure auctions can be a dangerous place for people who don't know what they're doing or are relying on help from people who are sloppy or negligent.

Mr. Phelps and Mr. Whitehead had a real estate broker who was supposed to be checking the records of the home they wanted to buy at auction. But the broker did not discover, or did not report to them, the fact that the property had several claims against it.

They considered suing the broker, but first turned to the auction company, Executive Trustee Services, a unit of GMAC Mortgage (one of the companies that suspended many

foreclosures in recent weeks). At the company's Burbank, Calif., office, a representative told Mr. Phelps that all sales were final and that Executive Trustee was merely a middleman. Mr. Phelps asked for further documentation and was told that he could have it when he returned with a subpoena. Classy, no? Gina Proia, a spokeswoman for the company, did not respond to requests for comment.

The couple also wrote plaintive letters to executives at Wachovia, now part of Wells Fargo, because both defaulted loans attached to the home they were trying to buy came from that bank. (The auction company was working on the bank's behalf.)

After a couple of rounds of e-mail and phone inquiries on my part, the bank decided to give Mr. Phelps and Mr. Whitehead their money back. "Given the circumstances, we have decided to rescind the sale on the property and return the funds to the buyers," Vickee J. Adams, a Wells Fargo spokeswoman, wrote in an e-mail on Friday.

Meanwhile, the couple, having nearly lost most of their life savings, now realize that they were in way over their heads bidding for homes at auction and were lucky to get their money back. "Trust no one," Mr. Phelps said. "We didn't get involved when the market was going crazy and everyone was getting subprime mortgages, and we felt like we were smart and that this was our reward for sitting on the sidelines. But there are enough bargains to be had on a straight sale."

**THE INSPECTION** Let's say you do manage to get a loan, resist the auctions and take the straight sale approach, shopping through a real estate agent. You'll want to make any bid for a home contingent on a thorough inspection from someone familiar with foreclosed properties.

Mold may be your first concern, especially in more humid climates, given that many foreclosed homes have been uninhabited for months.

Then there's sabotage. You should arrange (or have the real estate agent arrange) to have the power and water turned back on before the inspection if possible. Why? The previous owner (or vandals who have been in the home since) may have cut wires behind walls or poked holes in pipes in various places. Having running water and power can make these things easier to detect.

The pour-concrete-down-the-toilet trick is one that most good inspectors know to look for. But Jon Bolton of The Inspectagator in Oviedo, Fla., recently ran into a bit of destructive ingenuity he'd never encountered.

"Someone went on the roof with a bag of cement and dropped it down the chimney," he recalled. "It rained, and now you have a solid block of concrete somewhere where it's extremely difficult to get in to break it up. That's just wrong."

Also, don't forget to inspect the minutes of the condominium board or homeowners' association, if there is one. It may be in deep financial trouble if other foreclosures have occurred. Ms. Tolbert says that a good title insurer may be able to help with contacts if you have no luck finding the manager or treasurer on your own.

**THE TITLE INSURANCE** Speaking of which, title insurance is a must, particularly now. In the unlikely event that a former owner somehow wins back rights to the foreclosed home you end up buying and then tries to kick you out, you will need to make a title insurance claim.

And if you plan to put a lot of money into fixing up the home, you'll want to ask about a rider on the insurance policy that can cover you for more than what you paid to buy the property.

**THE WAITING GAME** Still worried about the prospect of former owners showing up someday and asking for their home back? Cyd Weeks, a real estate agent with Palmcoasting.com in Palm Coast, Fla., suggests waiting a few months before trying to buy a foreclosed home. Now that all eyes are on the foreclosure process, he said, homes coming on the market early next year will probably have been foreclosed upon with much more care and precision.

Indeed, Ms. Weeks's tip suggests a larger point. Given the foreclosure moratorium that some banks have put in place and the lengthy investigations and lawsuits that are sure to follow, there is no rush to buy as long as you don't have to move or if renting is an option.

Take your time. Assemble a panel of experts and apprentice yourself to them. And watch the listings carefully. For better or for worse, foreclosed properties are going to be available for a very, very long time.

**Wells Fargo Center for the Arts**

**Founders**
Gerald & Catherine Ayers
Hugh & Nell Codding
Tom & Betty Freeman
Benny & Rosemary Friedman
Chet & Gloria Galeazzi
Ed & Marion Gauer
John & Delores Headley
Bob & Olive Kerr
Bill & Lori Manly
Evert & Ruth Person
Ralph & Lois Stone
Henry & Madelyne Trione

WFCA Theater
**Date:** November 5, 2010
**Time:** 8:15 am - 9:00 am

Bigwig Lunch with Henry Trione
**Date:** November 10, 2010
**Time:** 1:00 pm - 2:00 pm

KPN BASH
**Date:** November 11, 2010
**Time:** 5:30 pm - 7:30 pm

Submit Your Events | More Events>>

Click here to view calendar.

Bigwig Lunch Time with Henry Trione
**Date:** September 16, 2009
**Time:** 12:00 pm - 1:00 pm

**Location:** Show map
Santa Rosa Chamber of Commerce
637 First Street
Santa Rosa, CA 95404

**Contact:** Kelly Bass
**Phone:** 707.545.1414 x16
**Email:** kellyb@santarosachamber.com

Join us for our Bigwig Lunch Time (BLT) with Santa Rosa businessman and philanthropist Henry Trione. The lunch will be held at the Santa Rosa Chamber offices, as a tribute to Mr. Trione's term as President of the Santa Rosa Chamber 50 years ago. Henry Trione is a leader in the community and was influential in the acquisition and establishment of Annadel State Park and the Luther Burbank Center for the Arts (Wells Fargo Center).

Henry is credited for "making things happen". Some of his past business successes include:

- Chairman - Geyser Peak Winery, Geyserville, CA
- Director Emeritus - Wells Fargo Bank
- Founder and Owner - Sonoma Mortgage Corporation
- Limited Partner - Oakland Raiders
- Co-owner and Chairman - Molalla Lumber Company
- Chairman - Summit Savings and Loan Association
- Director - Trione Vineyards
- President - Air Carrier Supply - Miami, Florida
- Member Board of Directors - Masonite Corporation - Chicago
- Member Board of Directors - National Corporation of Housing Partnerships - Washington, D.C.

$10, lunch included.
YPN members only, please.



May 9, 2010 ... Their father, **Henry Trione**, started Sonoma Mortgage Corp. in **Santa Rosa** in 1943 and later merged it with **Wells Fargo** Bank.

During the boom years, profits often lagged competitors who dabbled in riskier markets. But to Vic Trione, who co-founded the bank with his brother Mark in 1983, a steady approach has always been the goal.

"We are in the business to make loans and take savings," said Trione, who is chairman of the bank. "We can't lose sight of the fact that is our primary focus."

Vic and Mark Trione were raised in a banking household. Their father, Henry Trione, started Sonoma Mortgage Corp. in Santa Rosa in 1943 and later merged it with Wells Fargo Bank. He became a senior vice president with Wells Fargo in 1973, and joined its board of directors in 1977.

The family also has played a large part in shaping Sonoma County.

Now as Luther Burbank Savings expands into the Los Angeles area, Vic Trione is quick to avow his commitment to the hometown market and their steadfast approach.

"Our home is still up here in Northern California," he said. "We want to strike a balance. And I think we are doing that."



Secretary of State        Administration    Elections    **Business Programs**

**Business Entities (BE)**

Online Services
- **Business Search**
  **Disclosure Search**
- **E-File Statements**
- **Processing Times**

**Main Page**

**Service Options**

**Name Availability**

**Forms, Samples & Fees**

**Annual/Biennial Statements**

**Filing Tips**

**Information Requests**
(certificates, copies &
status reports)

**Service of Process**

**FAQs**

**Contact Information**

Resources
- **Business Resources**
- **Tax Information**
- **Starting A Business**
- **International Business
  Relations Program**

**Customer Alert**
(misleading business
solicitations)

## Business Entity Detail

Data is updated weekly and is current as of Friday, November
19, 2010. It is not a complete or certified record of the entity.

| | |
|---|---|
| Entity Name: | TREEWELL INVESTMENTS, LP |
| Entity Number: | 200927500001 |
| Date Filed: | 10/01/2009 |
| Status: | ACTIVE |
| Jurisdiction: | CALIFORNIA |
| Entity Address: | 1690 HAPPY VALLEY RD |
| Entity City, State, Zip: | SANTA ROSA CA 95409 |
| Agent for Service of Process: | HENRY M TRIONE |
| Agent Address: | 1690 HAPPY VALLEY RD |
| Agent City, State, Zip: | SANTA ROSA CA 95409 |

\* Indicates the information is not contained in the California
Secretary of State's database.

\* **Note:** If the agent for service of process is a corporation, the
address of the agent may be requested by ordering a status
report.

- For information on checking or reserving a name, refer to
  **Name Availability**.
- For information on ordering certificates, copies of
  documents and/or status reports or to request a more
  extensive search, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search
  Tips**.
- For descriptions of the various fields and status types, refer
  to **Field Descriptions and Status Definitions**.

**Modify Search    New Search    Printer Friendly    Back to
Search Results**

**Privacy Statement** | **Free Document Readers**

Copyright © 2010   California Secretary of State



EQUITY TITLE
COMPANY

"We've got you covered"

|  |  |
|---|---|
| **Primary Owner:** | TRIONE HENRY MARK |
| **Secondary Owner:** | |
| **Mail Address:** | 1690 HAPPY VALLEY RD |
| | SANTA ROSA CA 95409 |
| **Site Address:** | 1921 TERRACE WAY |
| | SANTA ROSA CA 95404 |
| **County:** | SONOMA |
| **Assessor Parcel Number:** | 181-540-021 |
| **Phone:** | |
| **Census Tract:** | 1523.00 |
| **Housing Tract Number:** | |
| **Lot Number:** | |
| **Page Grid:** | 384-G4 |
| **Legal Description:** | Abbreviated Description: REMAP FROM 015-321-002-000 - 09/13/97 |

**Property Characteristics**

Bedrooms : 3
Bathrooms : 3
Total Rooms : 9
Zoning :
No of Stories : 2
Building Style :

Year Built : 1951
Garage :
Fireplace : 1
Pool :
Latitude : 38.457444

Square Feet : 1,909 SF
Lot Size : 8,100 SF
Number of Units : 1
Use Code : Single Family Residential
Longitude : -122.702116

**Sale & Loan Information**

Transfer Date : 07/21/2004   Seller : BALDWIN, DONALD L; BALDWIN, PEGGY L
Transfer Value : $507,000   Document # : 20040111672                    Cost/Sq Feet : $265
First Loan Amt : $240,000   Lender : GUARANTY RESIDENTIAL LENDING INC
Title Company : NORTH BAY TITLE CO

**Assessment & Tax Information**

Assessed Value : $567,000
Land Value : $194,000
Improvement Value : $373,000
Market Improvement Value :
Tax Year : 2010

Percent Improvement : 65.78%
Tax Amount : $6,285.48
Tax Account ID : 181540021000
Market Land Value :

Homeowner Exemption :
Tax Rate Area : 4-002
Tax Status : Current
Market Value :

Data Deemed Reliable, But Not Guaranteed.

Generated by TallPDF.NET Evaluation
Branch :132,User :W004

Station ID :NRGS

Recording requested by:
**LPS Default Title & Closing**

When Recorded Mail To:
**NDEx West, L.L.C.**
15000 Surveyor Boulevard, Suite 500
Addison, Texas 75001-9013



**2009091340**
OFFICIAL RECORDS OF
SONOMA COUNTY
JANICE ATKINSON

GENERAL PUBLIC
09/21/2009 10:52 SBST
RECORDING FEE: 11.00
PAID

2   PGS




SUB20090015001510

Space above this line for Recorder's use only

Trustee Sale No. : 20090015001510          Title Order No.: 090505066

## SUBSTITUTION OF TRUSTEE

WHEREAS, **MARIA ESTELA JIMENEZ AND RAUL JIMENEZ LOPEZ** was the original Trustor, **GOLDEN WEST SAVINGS ASSOCIATION SERVICE CO.** was the original Trustee, and **WORLD SAVINGS BANK, FSB** was the original Beneficiary Recorded on **09/28/2005 as Instrument No. 2005143933** of official records in the Office of the Recorder of SONOMA County, California, as more fully described on said Deed of Trust.; and WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and instead of said prior Trustee.

NOW, THEREFORE, the undersigned hereby substitutes, **NDEx West, L.L.C., WHOSE ADDRESS IS:**     **15000 Surveyor Boulevard, Suite 500, Addison, Texas  75001-9013, as Trustee under said Deed of Trust.**

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

DATED:     **SEP 1 4 '09**

WACHOVIA MORTGAGE, FSB FORMERLY KNOWN AS WORLD SAVINGS BANK FSB



Keo Vang          Attorney in Fact

State of ____Minnesota____ }
County of ____Dakota____ }

On     **SEP 1 4 '09.**          before me,     ....... Mo... 3                          , Notary Public,
personally appeared _____Keo Vang_____          who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on  the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature: _____ (Seal)

My commission expires: _____

JAMES C. MORRIS
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2014

FCUS_SubstituteOfTrustee.rpt - 6/16/09 - Ver 27                                                    Page 1 of 1

Click here to unlock TallPDF.NET

Exhibit I to Request for Judicial Notice
Page 53



WHEREAS, "Lender" now desires to exercise its right to remove the Trustee and any subsequent successor trustee and name ***Brock & Scott, PLLC*** as Substitute Trustee his/her successor (if more than one party is appointed, any party may act);

NOW THEREFORE, "Lender" does hereby remove the Trustee and any subsequent successor trustee in the Deed of Trust ***dated April 11, 1989 and recorded on April 12, 1989 in Book 785 at Page 582***, in the Public Registry of ***Orange*** County, and does hereby appoint **Brock & Scott, PLLC** as his/her successor as Substitute Trustee. The Substitute Trustee shall have all the rights, powers, duties, obligations and privileges conferred by the Deed of Trust on the Trustee.

Should the undersigned become the last and highest bidder at the foreclosure sale, the Substitute Trustee is hereby authorized to transfer and assign said bid and to convey title to said foreclosure property to whomsoever the undersigned shall authorize. The statement in the Substitute Trustee's Deed that the undersigned has requested transfer of its bid to Grantee(s) in the Substitute Trustee's Deed shall be binding on the undersigned and conclusive evidence in favor of the assigned or other parties hereto, that the Substitute Trustee was duly authorized and empowered to execute same.

IN WITNESS WHEREOF, "Lender" has caused these presents to be executed in its name by its officers under seal, this _____ day of _____ , 20 _____.

**Household Realty Corp**

By: _____
Printed Name: _____
Title: _____
Attorney in Fact: LPS Default Solutions, Inc.

STATE OF _____ )
COUNTY OF _____ )

I certify that the following person personally appeared before me this day, acknowledging to me that he / she voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated:

_____ (name of signer)LPS Default Solutions, Inc., as Attorney in Fact for Household Realty Corp (beneficiary).

WITNESS my hand and official seal this _____ day of _____ , 20 _____.

_____          _____
Notary Public                  My Commission expires

This notary acknowledgment made pursuant to new NCGS §10B-40, §10B-41, §47-37.1(b). Effective December 1, 2005.
(NOTARY SEAL)



SHOUA MOUA
NOTARY PUBLIC · MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2012



# Max Gardner's Top 200 Signs that You have a False Document

(Mortgage Affidavits & Assignments & Endorsements)

1.   The document has notarized in Dakota County, Minnesota.

2.   The document was notarized in Hinnepin County, Minnesota.

3.   The document was notarized in Duval County, Florida.

4.   The document was notarized in San Diego, California.

5.   The document was executed the same day it was filed with the court.

6.   The party who signed the document executed it as "an authorized agent" for the servicer or the creditor.

7.   The party who signed the document executed it as "an attorney in fact" for the servicer or the creditor.

8.   The name of the signing party is stamped on the document in block letters.

1

04

9.   The name of the servicer or creditor is stamped on the document in block letters.

10   The document appears to be a standard form with "fill-in-the-blanks" for the names of the signors and entities.

11.   The paragraph numbers are not consistent (for example the first page may end with paragraph number 7 and the second page may start with number 10).

12.   The party who signed the document and the notary are one in the same.

13.   You cannot read the signature of the signor and the name is not printed out on the document.  Some people refer to these as "squiggle marks."  The bottom line is you cannot decipher any name or word from the same.

14.   The signature on the document consists of one loop in the shape of an S or something that looks like an 8.

15.   The date the signature was affixed and the date of the notarization are not the same.

16.   The same "officer" or "vice president" of a bank or lender is also the "vice president" or "officer" of many other banks or lenders in the chain of assignments or endorsements

17.   The same "officer" or "vice president" of a bank or lender signing the documents turns out to be located in various cities across the United States.

18.   The document includes numerous pre-stamped names and signatures.

2

205

19. The document includes a second or last page notarization that does not conform in type font or style to the format or font on the primary pages of the document.

20. Backdating of dates on assignments or the signatures of officers are dated years after an entity has been out of business, merged with another entity, or filed for bankruptcy.

21. Any document signed by an officer of MERS. MERS states at www.mersinc.org that: "Employees of the servicer will be certifying officers of MERS. This means they are authorized to sign any necessary documents as an officer of MERS. The certifying officer is granted this power by a corporate resolution from MERS. In other words, the same individual that signs the documents for the servicer will continue to sign the documents, but now as an officer of MERS.

22. The party who signed the document executed it as a representative of the servicer.

23. The notary failed to attach a notarial seal.

24. The notary failed to sign the notarization.

25. The name of the party appearing before the notary is blank.

26. The endorsement is not at the foot of the note but on a separate allonge to the note. If there is room at the foot of the note, the endorsement must appear here. An allonge may only be used if there is insufficient room at the foot of the note for the endorsement.

27. The document is signed on say June 1, 2008 with an effective date of say April 1, 2005.

3

206

28.   The document purports to assign the mortgage or the deed of trust from the originator directly to the trust.

29.   The document that purports to assign the mortgage or the deed of trust to the trust is dated BEFORE the trust was registered with the SEC.

30.   The document that purports to assign the mortgage or the deed of trust to the trust was signed AFTER the cut-off date for the transfer of all such instruments to the trust pursuant to the Pooling and Servicing Agreement.

31.   The document that purports to assign the mortgage or the deed of trust to the trust was signed AFTER the date for the acceptance of any final conveyance to the trust as provided for by the Pooling and Servicing Agreement.

32.   The origination date on the mortgage note is not within the origination and cut-off dates provided for the by terms of the Pooling and Servicing Agreement.

33.   The mortgage note is "assigned" rather than endorsed from party "A" to party "B" or from any party to another party or entity.

34.   The mortgage or deed of trust is "endorsed" rather that "assigned" from party "A" to party "B"or from any party to another party or entity.

35.   The mortgage note is endorsed from the originator to the securitized mortgage trust.

36.   The mortgage note is endorsed from the originator to the current mortgage servicer.

37.   The mortgage note is endorsed from the originator to the depositor for the securitized trust.

4

38.   The endorsement of the mortgage note is not at the "foot" or the "bottom" of the note.

39.   The affidavit is a "Lost Note Affidavit" filed by the mortgage servicer.

40.   The affidavit is a "Lost Note Affidavit" filed by the Trustee for the securitized trust and claims they never received the original note.  You can only file a lost note affidavit under the UCC if you possessed the note before it was lost.

41.   The affidavit is a "Lost Note Affidavit" period.

42.   The assignment of the mortgage or the deed of trust was filed or signed after the filing of the bankruptcy case.

43.   The assignment of the mortgage or the deed of trust was filed or signed after the filing of the foreclosure proceeding.

44.   The assignment of the mortgage or the deed of trust was filed or signed after the filing of the motion for relief from stay.

45.   The affidavit was signed by an employee of MR Default Servicers or has the MR Default Servicers information on the document as an identification number.

46.   The affidavit was signed by an employee of Promiss Solutions or has the Promiss Solutions information of the document as identification number.

47.   The affidavit was signed by an employee of NDEx Technologies, LLC, or has the NDEx information on the document as an identification number.

5

208

48. The affidavit was signed by the same attorney who signed the complaint.

49. The affidavit was signed by the same attorney who signed the foreclosure petition.

50. The affidavit was signed by the same attorney who filed the motion for relief from stay.

51. The affidavit was filed by an employee of the attorney who signed the complaint.

52. The affidavit was signed by an employee of the attorney who signed the foreclosure petition.

53. The affidavit was signed by an employee of the attorney who signed the motion for relief from stay.

54. The affidavit or certification was signed by Steve Kane.

55. The affidavit or other document was signed by Scott Anderson.

56. The documents are clearly two photocopies of the same document with different information filled in regarding the names of the assignor and assignee.

57. The note is stamped with the following: "Certified True Copy."

58. The signature of the Vice President states that he or she is a VP of say Lehman Brothers Holding Company but the printed or stamped name on the document is Lehman Brothers Bank, FSB.

59. The document is signed by a "Bank Officer" without any designation of the office held.

6

60.   The affidavit includes the following language on the bottom of each page: "This is an attempt to collect a debt. Any information obtained will be used for that purpose." This normally always indicates that the document was produced by a debt collector's law firm as their systems automatically default this data onto any document.

61.   The affidavit is signed by the "designated agent" of any entity or party.

62.   The document is signed by any person who identifies himself or herself as a "media supervisor" or a "media coordinator."

63.   The affidavit includes one or more bar codes like you see on items purchased at the grocery store.

64.   The affidavit is signed by an individual who states that they are the "legal coordinator" for the creditor.
65.   The date of the signature on the affidavit and the date of the notarization are not the same.

66.   The printed notary representation is marked through and some type of handwritten notation appears regarding the type of identification submitted by the alleged signor.

67.   The affidavit is signed by the "designated or appointed agent" for the creditor or debt collector.

68.   The return address on the Assignment or affidavit is to a third party provider such as Financial Dimensions, Inc, FANDO or FNFS.

69.   The transferor and the transferee have the exact same physical address including the same street and post office box numbers.

7

01:

125. The document is signed by Steve Moe.

126. The document is signed by Taylor Moore.

127. The document is signed by Annmarie Morrison.

128. The document is signed by Melissa Mosloski.

129. The document is signed by Kim Mullins.

130. The document is signed by Susan Nightingale.

131. The document is signed by Richard Olasande.

132. The document is signed by Ingrid Pittman.

133. The document is signed by Rona Ramos.

134. The document is signed by Paige Sahr.

135. The document is signed by Kimberly Sanford.

136. The document is signed by Erika Spencer.

137. The document is signed by Renae Stanton.

138. The document is signed by Maya Stevenson.

139. The document is signed by September Stoudemire.

140. The document is signed by Emmanuel Tabot.

141. The document is signed by Keo Maney Kue Vang.

142. The document is signed by Rebecca Verdeja.

143. The document is signed by Kim Waldroff.

11

214